Case number 22-1054, Pacific Networks Corp. and ComNet USA LLC Petitioners v. Federal Communications Commission and United States of America. Mr. Wright for the petitioners, Mr. Omnipotent for the respondents. May I please report, I'm Christopher Wright representing Pacific Networks and ComNet. Those two companies do not pose national security threat under Team Telecom's 14-factor test. It was not applied to them, but was applied with respect to every other Chinese owned entity so far. Under what test? I just didn't hear you. So Team Telecom has a 14-factor test that was not applied in our case. And it is not possible to conclude that my clients pose a national security threat under that test. That's because prior to the revocation of their authorizations, their primary business was selling prepaid calling cards. Team Telecom's test sensibly focuses on domestic communications networks. And you just can't use calling cards to harm networks. In fact, the FCC did not so conclude. What's missing here is the analysis that you'll 69 of China Telecom, the order relating to the Team Telecom recommendation relating to that. Now, we agree that they should get a hearing, but it's just, in that case, Team Telecom, the real national security experts explained at some length that you could misroute traffic from Google and Verizon traffic has been misrouted. There's allegations about great scan and attacks on entities. None of that surprised us. Nobody has alleged anything. That's one of the national security concerns. But the same group of national security experts tells us we should be worried about China having access to the customer records. And that the calling cards implicate that concern. So, no. Team Telecom declined to make a recommendation when the FCC asked. Team Telecom has not endorsed this espionage, blackmail and espionage theory. The FCC completely disowned the Team Telecom test here, which we consider unreasoned decision-making, and instead went off on its own test, unlike, again, all of the other cases involving China. And it ultimately said, relying on an NBC News report rather than a Team Telecom test, that you could use information like the phone numbers people call to blackmail them into spying for China. You're right. They stopped short. They were less definitive than they could have been in the time they had. But there's a lot of concern in the submission that they made to the FCC about inherent national security risks attached to and they have increased significantly in recent years. The environment has changed since the 2014 authorizations. So, with respect to Team Telecom's letter here, one thing we know is that three members of Team Telecom, which are Justice Homeland Security and Defense, instructed the Chief Counsel of NTIA to respond to the FCC's request by declining to make a recommendation. That's in the first paragraph. Then there's the next eight pages are all cut and pasted from other orders. None of them explain how prepaid credit calling cards pose a national security threat. And, you know, I suppose the Chief Counsel felt she had authority to cut and paste these things. But the only thing we know from the real national security experts is that they declined to make a recommendation. They have a test. The FCC didn't apply it. And, again, what's missing is you'll look at factors eight through 12. They're just not in that Team Telecom order. What's that pages 59 and 69, the China Telecom's appendix. Nothing like that in our case. I hear you, but they are saying that there's a heightened risk involving China and telecommunications. And why can't the FCC take that premise and then build on it a little bit using their expertise about calling cards? So, Your Honor, I would say they're subtracting from it, not building because they're just not applying the guts of the test. They've come up with their own. They talk about risks from calling cards. Should I assume it's not completely? From calling cards is that somebody could figure out and these are their own examples that you have bad credit history or that you've been calling alcoholics anonymous or something like that, or that your mistress have a mistress. That's another of their examples. And then the blackmail. And that's the FCC's analysis. Would have been easy for Team Telecom to say we agree if they agree. They didn't do that. So, that's what's really missing. They didn't disagree though, right? Pardon? They didn't disagree. They made no recommendation. I mean, what you're describing, sure, it's a little bit speculative. We don't know for sure, but it sounds a little bit like what the U.S. government does every day in adjudicating security clearances. They ask about all that kind of stuff. Yeah, I'm sorry, but Team Telecom test, the test, again, I'm not saying it was correctly applied to anyone else, but it's a sensible test, sort of, can you disrupt traffic? Can you get into other people's computers? You know, that's just silly with respect to prepaid calling cards. That's why I think they didn't do it. You talked about them having a short amount of time. My goodness, if Team Telecom had said, geez, we'd like a little more time to answer your question, would the FCC have said no? Team Telecom sent another letter six months later. You know, they could have said revoke their authorizations if they thought it was warranted. And actually, if I could pivot to talk about the procedural issue for a moment and address the questions that you and Judge Edward asked from our client's perspective, what we want and didn't get, two things, a neutral adjudicator and an opportunity to cross-examine. They would have made a huge difference here. If we had an adjudicator who could not be transferred by the FCC, that adjudicator would have felt free to conduct a really fair hearing, in our view, and would have asked questions like, oh, come on, black male people can have them spy for China because they have poor credit history or mistress. You know, do you have anything more than an NBC News report? And secondly... This is the ALJ point. Yeah, that's the ALJ part. It would have been hugely important to have an ALJ. And the same thing... The same ALJs that under free enterprise fund might be unconstitutionally insulated from presidential control. A due process requires what than a bureau chief at the FCC, who the chair can send to the tariff office if the chair will. An ALJ can't be punished in that way. A neutral adjudicator would have made a huge difference and they would have asked hard questions. And again, we didn't even get a paper explanation the way the other companies had, you know, applying what we think is proper tests the FCC should have applied. And, you know, it sure would have been great if some real national security expert had testified before a neutral adjudicator. And the neutral adjudicator, first of all, could have asked, you know, unbiased questions, and we could have brought in a special examiner to tell us how prepaid calling cards really pose any threat. Has anybody else ever thought that this blackmail message... Well, it isn't the calling cards per se. It's access, possible access to U.S. data on shared database. Isn't that what we're really talking about here? I'm sorry, your honor. It isn't the mere presence of the calling card. It's the possible access to data on shared database. Isn't that what we're talking about? Because of China's ultimate ownership interest in the access to data. Isn't that what we're talking about? We don't dispute that any carrier learns information about things like the numbers the people call. What we don't have here is a real national security expert saying that... No, no, no, wait. Stay with my question. Don't we have the shared... What we do have is an assertion that, and I don't think it's refuted, that there is access to U.S. data on shared databases and China is the ultimate owner here, just as in the other case, right? So, there are privacy... Obviously, there are privacy interests of individuals involved here. I don't know... No, no, no, wait. I really... You can add whatever you want. I just want to make sure I have this straight in my head. I don't see you contesting the assertion that there is access to U.S. data on shared databases and China is ultimately the owner here, just as in the other cases, and that's the concern that's being expressed. They therefore have access by virtue of ownership to data that the U.S. is asserting here. We don't want them to have access to it, right? Is that wrong that they have access or not? I think you're not fully understanding the limited amount of data there is. In order to... No, I'm not expressing any understanding one way or the other. I want you to know what's in my mind based on what I've heard from the other side and hear what your response is. My understanding is concern is, greatest concern in this case, because of the way the case has been played out, is the possibility of access to databases which they should not have access to. So all telecom carriers have to keep records of what numbers are called in order to build... All carriers do not have China as the ultimate owner. So a couple of points here, Your Honor. The FCC ultimately decided this on a national security basis, right? And so unless you agree with their blackmail and espionage theory, which again, no expert has endorsed, the fact that data... Why do I have to go that far? You're avoiding my assertion on behalf of the government. I don't know whether it's right or wrong, but you're not even responding, which makes me suggest that you're not disagreeing. Their arguments, I thought, was, look, China has access by virtue of their position with this company. China has access to U.S. data on shared databases, and we don't want that. That's their claim. So I don't know that they're shared databases. They're the company's own databases, basically, for billing. I don't disagree that the owner... And it would be great to tell them in ALJ why this wouldn't happen, but could the owner of the company violate the law and do something like find out that caller has called Alcoholics Anonymous or can't pay their bill and therefore might have bad credit? Yes, that could happen. That's the FCC's theory. No, I think their theory... We'll hear from them. I think their theory embraces more than what... You're doing it self-servingly, and if I were in your position, I would too, but I think they're asserting more the access to the databases, in their view, is not insignificant because China's in play and China's the owner. Now, you're not... Just from my point, you're not giving me a healthy, robust answer that serves you well. I'm not sure I understand your answer. So let me try again. So again, Team Telecom's more sensible test would tie what the services are to ways of misrouting traffic or ways of conducting cyber attacks and getting data out of somebody else's database, trying to find out how a case is going to come out from this source. Nothing like that here. The specific networks in ComNet have got caught up with a lot of much larger companies with different service lines, and again, I think they ought to be able to argue before an ALJ as to why they don't present a problem, but we certainly do. And again, in addition to neutral ALJ, the second thing procedurally that's really important here and that would make a difference is to cross-examine a real national security... Yes, I'm sorry. To cross-examine a real national security expert. And the FCC says, well, that's too big a burden. I don't think cross-examining, you know, having one expert explain to an ALJ why they see a national security problem and allowing us to cross-examine them. That's all we really need. All right. Thank you. Mr. Novak. Good morning again, Your Honors. I think that any suggestion that the executive branch agencies here didn't support the FCC's actions is thoroughly lied by the record. I would commend the Court to simply read the executive branch filings here. I think it's clear that they support the FCC's actions, and you'll find those in the joint appendix in this case at pages 109 to 121 and pages 265 and 267. And as I think Judge Patz has recognized, those recommendations explain that the executive branch agencies think the company's authorizations raise serious national security concerns that couldn't reasonably be mitigated. I think that it's also... I disagree with my friend's submission that the executive branch agencies have somehow purported to adopt some single overarching exclusive test for everything that might constitute a possible national security threat. I think, first of all, and I understand this is based on the recommendation of China Telecom, and if you take a look at that recommendation, first of all, it makes clear that the factors outlined there are illustrative, not exclusive or exhaustive. It says that the factors include, but aren't limited to, those that are listed, and Factor 12, one of them referenced by Mr. Wright, is a catch-all for all other activities with potential national security implications. On top of that, I think even if you look just at the factors expressly discussed in the China Telecom recommendation, you'll see that the threats posed by the company services here are covered. That recommendation discusses risks of communication intercepts, risks of covert monitoring, risks of economic espionage. Those are the same risks that were identified by the commission here in its replication order. And there is a lot of concern expressed in these letters of Team Telecom responses, no question about it, but they do have a level of generality to them. This is just about China and telecommunications, and there is this express reservation right up front that this response is not offered as a recommendation. These are factual questions, and we haven't had time to assess. So, and you have an argument on the other side that even if we accept all the general concerns about national security, these companies are selling products that don't really implicate them. So what are we to make of that? Yes, so let me first take your comment about the express reservation at the start, and then turn to the generality issue. Sure. In terms of the express reservation, I think that fairly read, what it says is that this isn't a formal recommendation under the process set forth under a particular executive order, but explains that for two reasons. That's number one, because the executive agencies here were being asked to weigh in on a relatively short time period, and the process to do a formal comprehensive recommendation can be fairly cumbersome. And number two, unlike in the China Telecom case, where the executive branch agencies were asking the FCC to start a novel proceeding, here the FCC was already on the case. We had their recommendation in China Telecom. We had issued an institution order. The process was already underway, and I think that given the other pressing demands on national security officials, it wouldn't have been a prudent use of the government's limited time and resources to then go through and produce a more comprehensive recommendation when the process was already going, and the FCC was on the case. So, would we have gone back and said, you know, we'd like a formal recommendation with all the T's crossed and the I's dotted? The FCC could have done so, but it wasn't required to do so, and I don't think it would have been prudent to do so. The FCC is required to support, give support in the record, substantial evidence to support the own order. Would it have been prudent? Sure, it would have been prudent. You did it in the other two cases, the other case. Why wouldn't you do it here? Because I don't understand what is it, flipping the questions I was asked in co-counsel, what is it that you're particularly concerned about? Can this be read to mean that anyone who has a connection with China, and China has some ownership interest, poses a national security interest, and you can revoke whatever license it is they're holding? Your Honor, I'll say first. They have a computer, and you could use their computer in their business and maybe do mischief, and China's the owner. Is that the test? No, Your Honor. In each one of these instances, in each one of these orders, the FCC did a I think my colleague was at least alluding to the question I'm trying to raise even more explicitly. I can understand what you're arguing in the other case. This is pretty clear. I don't know what you're arguing here. What is the potential risk? And what you said so far in 10 minutes hasn't filled that gap for me. What's the concern? The concern here is explained by the orders, and this touches on the FCC's communications expertise about calling cards and what they allow the companies to do, which is why this comes from the FCC, not the executive branch agency. Oh, come on. That's awful. Give me an answer in terms of what is the evidence. The other cases are clear what evidence you're relying on, the FCC is relying on. And here, your answer is, well, we didn't have time to put it all together. So just trust us. We think this is worrisome. So the first thing that occurred to me when preparing this case is, well, does that mean that anytime a company has a look, China has a large ownership interest in a company, they may have their license revoked? Is that the test? Maybe that's permissible. I don't know. But is that what you're saying here? Your Honor, I want to be clear. I'm not saying that we, the FCC, didn't have time to put it together. I think we did. There's an extensive order here. The executive branch response here... Okay, forget the executive branch. What is it you think is the compelling case that the FCC itself has presented to make it clear there is a serious national security risk, which is what they're relying on? Serious national security risk because what? What's the because? Because telecommunications carriers, including in the calling card context, by virtue of their position and the service they're providing... Can you limit it to the calling card context? That's all this case is about. So let's start the because again. Sure. So when you use these companies' calling card services, they know who you call, when you call them, how often you call them, how long you speak with them. They often also have your personal identifying information. So they often know who you are, where you live, often what your credit card number is, sometimes your credit history. And they can cross-reference all of this information with other data sources, with public records, with commercial databases, with hacked data, and in this instance, with any information collected by Chinese intelligence services. So I think if you take a look at page five of the executive branch response here, they talk about the Chinese government uses all available levers to steal sensitive U.S. person data and trade secrets. I think the theory here is that the Chinese government has at every opportunity been vacuuming up any potentially sensitive information it can collect on U.S. citizens and can combine that in ways that can be exploited by a foreign adversary. And I think you don't just have to take the FCC's word for it. Congress has recognized the dangers posed by these calling records and the congressional findings behind the Telephone Records and Privacy Protection Act of 2006. The executive branch agency filings here, I think, warn that the Chinese government could use these companies to conduct or increase economic espionage and collect intelligence against the United States. And other courts, like the Second Circuit decision we cite, have referred to the startling amount of information that telecommunications providers have accessed. So, you know, I think even if the court were to look at this, say, through the Youngstown framework, here you have all three branches of government warning there are real dangers with this sort of information falling into the wrong hands, especially in combination with other information that may be in the hands of a foreign intelligence service. And I think there's no basis here then to second guess the government's considered national security judgments in this context. The problem is you don't have the other branches of the government weighing in as you did in the other case. It would be very compelling if you had that picture and you're glossing over that. I mean, I want you to know I'm paying attention. You're glossing over that as if it's so. It isn't so. It's exactly what Judge Cass has said. They kind of gave it a, well, you know, we didn't have enough time. And as a court that refuses administrative stuff all the time, our first instinct in that kind of a situation is to say, oh, we can get you more time. We'll send it back to you, take all the time you want, do what you should have done in the first place. Your Honor, I want to resist that a little bit. I would expect that. That doesn't surprise me. I mean, so I think the executive branch agencies came to us and gave us what they have from their standpoint. And then the commission adds something, which the other agencies don't have, which is the communications lens of understanding what, by virtue of the services they provide, in particular these calling card services, the companies can do. Now, I suppose you could envision a three-step process where the commission then goes back to the agencies and says, hey, OK, taking what you told us earlier from your expertise and now taking what we've together and button this up into a comprehensive explanation where everything appears in one piece of paper from the other executive branch agencies, rather than us giving you something where everything is stapled together in the FCC's order here. Now, I don't think anything requires that extra process. And I do think it would be problematic, particularly in the national security context, to add that sort of extra delay. There's always risk during that time that malicious activities could take place. And I think also, given the number of other pressing concerns on the plate of national security officials, there's another risk that you are diverting the government's limited resources from other national security concerns to undertaking extra process here that isn't necessary in this context. So I think that what we've given you is sufficient. I think it's particularly sufficient given the national security loss in this case. Am I correct? You mentioned delay in the other case, China telecom, that it took 19 months for the commission to issue the order. Depends a little bit on what your measurement points are, Your Honor. But I think the easiest answer there is that, as was reflected in the first case argued this morning, the FCC was had biased information in front of it in that case and was awaiting the district court's ruling on the visibility of that information. That came in, I believe, September of that year, and the commission adopted its order the following month, in October, and released it a few days later in November. So I don't think that there's any possible suggestion here the commission or the government wasn't acting with appropriate dispatch in this context. And I will say finally, to Judge Edwards' question, if the court does have any concerns that something further should have been done to button this up, to dot extra I's and cross that for T's, or maybe it's what we're talking about, dotting the J's and crossing the X's, I think at most that would call for a remand without vacature. The additional process, I do want to stress, would be significant national security dangers were there to be a remand in the interim that would allow some of these services to restart if this is simply a paperwork issue. Thank you, Your Honor. Does Mr. Wright have any time? All right, why don't you take a minute? Thank you, Your Honor. Especially with respect to your question, Judge Edwards, about the storage of data, I should have pointed out that, you know, a letter of assurance. If you look at JA71 to 73, you'll see evidence of lots of back and forth between Team Telecom and the companies. And specifically, Team Telecom has known about the data practices and has an objective. The companies have offered, you know, to the FCC, tell us what you want as mitigation for us to do with the record, and we'll do it. But the FCC sort of shifts position and doesn't have an answer here. The companies would do what they said, you know, if it's at all reasonable, I'm sure. I hope the court will vacate the order if the court, so the companies, our stay was denied, so the companies have ceased providing these services. So if you remand, I would, without vacating, I would ask that, as in many other cases, you ask the FCC to act within 90 days or six months, or you'll vacate the order because there'd be a real danger of the sitting. Thank you.
judges: Henderson, Katsas, Edwards